J-S34003-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| Appellee | |
| v. | |
| LAWRENCE WETZEL | |
| Appellant | No. 323 WDA 2013 |

Appeal from the Judgment of Sentence August 30, 2012
In the Court of Common Pleas of Venango County
Criminal Division at No(s): CC No. 378-2011

BEFORE:  GANTMAN, P.J., BENDER, P.J.E., and OTT, J.

MEMORANDUM BY OTT, J.:                    **FILED DECEMBER 24, 2014**

Lawrence Wetzel appeals from the judgment of sentence entered August 30, 2012, in the Venango County Court of Common Pleas.  The trial court imposed a sentence of 11½ to 23 months' imprisonment, followed by 36 months' probation, upon his jury conviction of homicide by vehicle.[1] Wetzel raises four issues on appeal:  (1) the trial court erred in permitting the deputy coroner to testify regarding the victim's cause of death; (2) the court erred in prohibiting Wetzel's accident reconstruction expert from testifying as to the cause of the accident; (3) the court erred in precluding defense counsel, during closing argument, from providing illustrations on the concepts of reasonable doubt and gross negligence; and (4) the verdict was

_____

[1] 75 Pa.C.S. § 3732(a).

against the weight of the evidence. For the reasons set forth below, we affirm.

Wetzel was arrested in March of 2011, and charged with homicide by vehicle, as well as three summary traffic offenses.[2] He filed an omnibus pretrial motion seeking either habeas corpus relief, or suppression of his statement to Trooper Dorden at the hospital. Following a suppression hearing, the trial court denied Wetzel's motion on November 16, 2011. Wetzel's case proceeded to a jury trial, and, on July 19, 2012, the jury returned a verdict of guilty on the charge of homicide by vehicle.[3]

The charges underlying Wetzel's conviction arose from a two-car motor vehicle accident that occurred at approximately 6:10 a.m., on the morning of July 14, 2010. Wetzel was driving his Dodge pickup truck northbound on Route 8, a two-lane roadway in Venango County. He was traveling behind a convoy of five construction workers heading to a job site in their personal vehicles. The vehicles were grouped "fairly close" to one another so they

_____

[2] *See* 75 Pa.C.S. §§ 3301 (driving on right side of roadway), 3305 (limitations on overtaking on the left), and 3306 (limitations on driving on left side of roadway).

[3] The trial court subsequently found Wetzel guilty of the Section 3305 and 3305 summary offenses. The Commonwealth withdrew the remaining charge.

they "wouldn't lose each other" on the way to the jobsite. N.T., 6/18/2012, at 28. The convoy was travelling near the posted 55 mph speed limit.[4]

David Harrison, who was driving the second vehicle in the convoy, testified that, although there was some fog that morning, it was lifting, and the visibility was "pretty good." *Id.* at 29. Harrison stated he saw Wetzel's truck attempt to pass the convoy by moving into the southbound lane, and "pull right up next to the last vehicle and then go at a steady pace with him." *Id.* at 30. Harrison then noticed the victim's vehicle traveling southbound, with the headlights illuminated. *Id.* at 31. He testified it appeared both cars noticed each other at the last minute, and both swerved in the same direction, toward the southbound berm of the road, to avoid an accident, but in doing so, crashed head on. *Id.* at 30.

Jay Dreves was driving the last vehicle in the convoy. He testified he did not notice Wetzel's pickup until it pulled beside him in the southbound lane. Almost immediately after he noticed the pickup, the accident occurred. *Id.* at 51. Dreves confirmed that although there was a light fog, he could see the lead car in his convoy. *Id.* at 52.

Immediately following the accident, the men in the convoy pulled over to assist the drivers. Dreves stated he took one look at the victim and knew

_____

[4] Although one driver estimated they were traveling "a little slower" than the speed limit, two other drivers in the convoy estimated the group's speed at 50 to 60 mph. N.T., 6/18/2012, at 28, 55, 120.

he was dead. *Id.* Dreves and several other witnesses then pulled Wetzel out of his truck, where he was pinned, before the truck caught on fire. Dreves testified that Wetzel kept asking, "How is my truck?" even after Dreves said to him, "You just fucking killed that kid." *Id.* at 54.

Wetzel was transported to the hospital due to his injuries, and Pennsylvania State Trooper John Dorben was assigned to interview Wetzel, about the accident. Trooper Dorban was told only that the police were "investigating a fatal accident and requested that we conduct an interview of the operator." N.T., 6/19/2012, at 4. He arrived at the hospital while Wetzel was still in the intensive care unit. Although Trooper Dorben observed that Wetzel "appeared groggy," he testified Wetzel gave him appropriate responses. N.T., 6/19/2012, at 5. He asked Wetzel what happened and Wetzel responded, "'he might have been looking for [his] cell' … that he had recalled crossing over the center line and an accident ensuing." *Id.*

Pennsylvania State Police Corporal Michael Fox was dispatched to the accident scene to perform a crash analysis. He noted the area where the vehicles collided was a no-passing zone, but "the area just south of the collision zone was a yellow dash line which indicates that it is a passing zone." N.T., 6/18/2012, at 77. The corporal acknowledged that the skid marks for Wetzel's car were located in a lawful passing zone. *Id.* at 105. He also testified speed was not a factor in the crash. *Id.* at 106-107.

Venango County Deputy Coroner Christopher Hile arrived at the accident scene at approximately 7:15 a.m., and viewed the victim still in his vehicle. *Id.* at 150. He explained the victim had "some of the most severe traumatic injuries that [he] had seen in a vehicle accident." *Id.* at 142. After further examining the body at the funeral home, Deputy Coroner Hile concluded that the victim died as a result of "blunt force trauma to the head and chest." *Id.* at 145.

Wetzel did not testify at trial. He presented only one witness, mechanical engineer David Bizzak, who testified as an expert in accident reconstruction. Bizzak opined the victim did not have his headlights illuminated before the accident, and, accordingly, Wetzel "didn't see the vehicle coming." N.T., 6/19/2012, at 72. He further concluded the foggy conditions also contributed to the accident. *Id.*

On August 30, 2012, the trial court sentenced Wetzel to 11½ to 23 months' imprisonment, followed by three years' probation for the charge of homicide by vehicle. The court also imposed a $25 fine for each of the summary offenses. Wetzel filed a motion for reconsideration of sentence, which the trial court denied by order entered January 4, 2013. This timely appeal followed.[5]

---

[5] On February 19, 2013, the trial court directed Wetzel to file a concise statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b). Wetzel complied with the court's order and filed a concise statement on March 13, 2013.

In his first issue, Wetzel contends the trial court erred when it permitted the deputy coroner to testify as an expert regarding the victim's cause of death. Wetzel argues Deputy Coroner Hile was not qualified to opine on the victim's cause of death because he is not a medical professional, he has limited qualifications and experience, and he did not perform an autopsy, but rather, conducted only an external examination of the body.

Like any evidentiary challenge, "[t]he admission of expert testimony is a matter of discretion [for] the trial court and will not be remanded, overruled or disturbed unless there was a clear abuse of discretion." *Commonwealth v. Brewer*, 876 A.2d 1029, 1035 (Pa. Super. 2005), *appeal denied*, 887 A.2d 1239 (Pa. 2005). When considering whether a witness is qualified to testify as an expert, the court must "determine whether the witness 'has any reasonable pretension to specialized knowledge on the subject under investigation.'" *Commonwealth v. Stallworth*, 781 A.2d 110, 121 (Pa. 2001), *quoting* *Miller v. Brass Rail Tavern, Inc.*, 664 A.2d 525, 528 (Pa. 1995). *See also* Pa.R.E. 702. However, "[i]t is well established … that expertise can be acquired through occupational experience as well as by scientific study." *Commonwealth v. Spotz*, 756 A.2d 1139, 1160 (Pa. 2000), *cert. denied*, 532 U.S. 932 (2001).

In the present case, the trial court, relying on *Commonwealth v. Smith*, 808 A.2d 215 (Pa. Super. 2002), determined that Deputy Coroner Hile "has a pretension of specialized knowledge on the cause of death in car

accidents" due to his "many years of experience as both mortician and deputy coroner combined with his education and experience as an EMT[.]" Trial Court Opinion, 5/9/2013, at 10.

We find the decision in **Smith** instructive. In that case, like here, the Court considered whether a deputy coroner was qualified to testify as an expert, and provide his opinion on the victim's cause of death. **Id.** at 227. Although this Court acknowledged "that *every* lay coroner is not entitled to offer an opinion as to the cause of death at trial[,]" the panel concluded that the deputy in that case had a "a pretension of specialized knowledge on the subject matter in question, qualifying him as an expert." **Id.** at 229-230 (emphasis supplied). The panel emphasized the deputy's "many years of experience as both mortician and the deputy coroner, combined with his education[.]" **Id.** at 230. Indeed, the deputy coroner in **Smith** had held the position for 15 years, during which time he had investigated hundreds of deaths. He had also been a licensed mortician for 16 years, and had a degree in mortuary science. In addition, he had taken three years of college coursework studying anatomy, pathology, and other sciences. **Id.**

We conclude that the deputy coroner in the present case possesses similar experience and education to the expert proffered in **Smith**. Deputy Coroner Hile testified that, at the time of the accident, he had been a deputy coroner for nine years, eight of them in Clarion County. N.T., 6/18/2012, at 137-138. He had also been a licensed mortician for 28 years, and an EMT for more than 25 years. Deputy Coroner Hile had a degree in mortuary

science, which included classes in anatomy and biology, and an associates degree from a local community college. *Id.* at 138. He estimated that, as a deputy coroner, he had been called to the scene of an accident where someone was deceased "[d]ozens of times." *Id.* at 140. Accordingly, we detect no abuse of discretion on the part of the trial court in qualifying Deputy Coroner Hile as an expert witness.

Wetzel also argues that Deputy Coroner Hile's external, cursory examination of the victim was insufficient to qualify him to opine on the victim's cause of death, particularly since he did not perform an autopsy. Again, we disagree.

A coroner, or one duly appointed as a deputy, is statutorily directed to investigate sudden or traumatic deaths within the county to determine (1) the cause of death and (2) whether the death may have resulted from a criminal act. 16 P.S. §§ 1231, 1237(a)-(b). If, after the investigation, the coroner is **unable to determine the cause and manner of death**, he is then authorized to order an autopsy, and if that proves futile, an inquest. 16 P.S. § 1738(a)-(b).

In **Smith**, the deputy coroner determined the victim's cause of death after performing a preliminary examination at the scene, and a more thorough examination after the body was transported to the hospital.[6]

---

[6] Similar to the present case, it appears that no autopsy was performed in **Smith**. **See Smith**, **supra**, 808 A.2d at 229 n. 11.

*Smith*, *supra*, 808 A.2d at 230. The deputy coroner observed the victim had "extensive hemorrhaging from the mouth, head, ears and nose" and that "[h]is chest and abdomen were 'very spongy to the touch and palpitation.'" *Id.* (record citation omitted). Based upon "his experience and examination," he opined that the victim died as a result of "blunt force injuries caused by the accident." *Id.* This Court found no abuse of discretion on the part of the trial court in concluding that the deputy coroner was qualified to render an opinion as to the victim's cause of death. *Id.*

Here, Deputy Coroner Hile also conducted a preliminary examination of the victim at the crash scene and a subsequent, more thorough examination at the funeral home. At the accident scene, Deputy Coroner Hile noted the victim had extensive injuries to his head and chest, which he described as "probably some of the most severe traumatic injuries that [he] had seen in a vehicle accident." N.T., 6/18/2012, at 142. Later, after the body was transported to the funeral home, the deputy performed "an extensive head-to-toe survey of [the victim's] injuries[,]" which revealed the following:

> [The victim's] head had some burning on the top of his head that looked severe. He also had a completely dislocated or severed jawbone or mandible as well as a maxillary bone which was completely broken off inside his mouth. … [The victim] had a skull fracture on the back of his head. He had extensive damage – swelling and extensive damage to his abdomen. Extensive bruising to his abdomen. He had compound fractures of both arms. The bones were protruding through the skin of both of his arms. Abdominal bruising. And I also believe that he had fractured legs, as well.

- 9 -

*Id.* at 143. Furthermore, Deputy Coroner Hile testified he also believed the victim had cervical damage because when he palpated the victim's neck from side to side, it was loose, as if the head was "non-attached to the rest of his body." *Id.* at 152. Based upon these findings, Deputy Coroner Hile determined that the victim's cause of death was "blunt force trauma to the head and chest," and the manner of death was "accidental." *Id.* at 145, 148. We agree with the trial court's determination that Deputy Coroner Hile, whose opinion was supported by physical findings, was qualified, based upon his experience and education, to testify regarding the victim's cause of death. Accordingly, Wetzel's first issue is meritless.[7]

_____

[7] Although the **Smith** Court cautioned against the *per se* qualification of lay coroners as expert witnesses, the Court's concerns are not evident in the present case. Indeed, the **Smith** Court urged trial courts to consider both the qualifications of the lay coroner, as well as the facts of the particular case, before determining whether a coroner could testify as an expert. **Smith**, *supra*, 808 at 229, n. 11. The Court explained:

> For example, in this case if the facts indicated that the accident occurred on the center line instead of the victim's fog line, who could say that the victim did not have a heart attack and swerve into [the defendant's] lane? The impact would produce the same outward injuries but without an autopsy, no one would know that a heart attack occurred.

*Id.* Similarly, in the present case, the undisputed facts indicate that Wetzel was travelling in the wrong lane of traffic when the accident occurred. Moreover, there was no evidence presented that either Wetzel or the victim had any medical condition that may have contributed to the accident.

Next, Wetzel challenges the trial court's ruling precluding his accident reconstruction expert from rendering an opinion as to the cause of the accident because the opinion went to the ultimate issue to be decided by the jury. Specifically, Wetzel objects to the trial court's preclusion of his expert's testimony regarding "the factors that led to the cause of the accident[,]" namely "the weather combined with the lack of vehicle lighting." Wetzel's Brief at 33, 35. He argues:

> It was critical for the jury to understand that there was a reasonable explanation for why [he] attempted to pass vechicles when the [victim's] vehicle was approaching him. Where [Wetzel] entered the oncoming lane … was a designated lawful passing zone. The Commonwealth's theory was that [Wetzel] acted recklessly because he left his lane of travel while [the victim] was obviously approaching. Therefore it was crucial to the defense in the case to inform the jury that in the defense expert's opinion, the weather combined with the lack of vehicle lighting, caused the vehicles, specifically **the defendant's not be able to see each other otherwise he would not have attempted the passing maneuver.**

*Id.* at 34-35 (emphasis supplied).

As noted *supra*, questions concerning the admissibility of expert testimony are within the discretion of the trial court, which we will not disturb absent an abuse of that discretion. **Brewer**, **supra**, 876 A. 1035. Generally, "[a]n expert's testimony is admissible when it is based on facts of record and will not cause confusion or prejudice." **Commonwealth v. Huggins**, 68 A.3d 962, 966 (Pa. Super. 2013), *appeal denied*, 80 A.3d 775 (Pa. 2013). Moreover, "opinion [testimony] is not objectionable just because it embraces an ultimate issue." Pa.R.E. 704.

Prior to the testimony of defense expert David Bizzak, the Commonwealth asked for an offer of proof, contending that Bizzak's expert report relied upon "information from the police report which [was] not in line with the testimony" provided at trial, and which included "a heck of a lot of assumptions." N.T., 6/19/2012, at 24. Following some discussion regarding Bizzak's findings, the trial court asked defense counsel to summarize Bizzak's final conclusion. Counsel stated:

> His final conclusion, as he said, is that – let me read it exactly. **That it was likely that the vehicles did not see each other** and that in his opinion the lights of the vehicle were off, given his review of where the light switch was and how the body ended up, and that the test for hot shock wasn't done that would have confirmed that. That was available. And that given the weather conditions, the combination of the two led to the accident.

*Id.* at 35 (emphasis added). The court ruled Bizzak could "express an opinion based upon his experimentation and his observation that the light switch was in the off position[,]" and, assume, based on a notation in the investigating officer's report, that fog was a factor. *Id.* at 36-37. However, the court agreed with the Commonwealth that Bizzak's ultimate opinion, that the drivers likely did not see one another before the accident, was speculation, and not permissible. *Id.* at 36.

During his testimony, Bizzak opined the headlights of the victim's vehicle were off at the time of the accident. In making this determination, Bizzak compared photos of the light switch assembly in the victim's vehicle

at the accident scene, with a replacement switch assembly for that same vehicle.[8]  N.T., 6/19/2012, at 68-71.  Further, Bizzak explained that "in foggy conditions if somebody's lights are not on[,] they are more difficult to see."  **Id.** at 72-73.  However, when questioned regarding his conclusion "as to the factors that led to the cause of this accident[,]" the Commonwealth objected, based upon the court's earlier ruling.  **Id.** at 74.  The trial court sustained the  objection.  **Id.** at 73.

In defending its ruling, the trial court explained:

[T]he expert's opinion on the cause of the accident was too speculative when [in] his report the expert opined, "that it was likely that the vehicles did not see each other and that given his review of where the light switch was and how the body ended up, and that the test for hot shock wasn't done that would have confirmed that.[9]  That was available.  And that given the weather conditions, the combination of the two led to the accident."  Jury Trial Day 2 of 2 Tr. 35: 12-21.  The expert did not have a basis for saying that the two drivers did not see each other and his opinion on the weather conditions was directly contradicted by the testimony at the trial.

Trial Court Opinion, 5/9/2013, at 19.

---

[8] It is important to note that the Commonwealth's accident reconstruction expert, Pennsylvania State Police Corporal Michael Fox, who responded to the crash site, testified that as a result of the accident the entire front end of the vehicle was "[b]asically in [the victim's] lap."  N.T., 6/18/2012, at 116.

[9] A hot shock test assesses whether "there has been energy transmitted or passed through the filament of an incandescent lamp … [and] can tell you if a light was illuminated at the time."  N.T., 6/18/2012, at 113.  The investigating officer testified the test would not have been helpful in this particular case, while Bizzak disagreed.  **Id.** at 114-115; N.T., 6/19/2012, at 67-68.

We detect no abuse of discretion on the part of the trial court.  It is noteworthy that Wetzel did not testify at trial.  Thus, even assuming the victim's headlights were not illuminated, an assumption which was directly contradicted by the testimony of an eyewitness, any opinion as what each driver saw immediately before the accident was pure speculation.  Moreover, although the investigating officer acknowledged, under cross-examination, that he noted in his accident report "the foggy conditions could have had a substantial impact in [the] accident,"[10] he did not testify that the weather was a causal factor at trial.  In fact, the only testimony concerning the weather conditions **at the time of the accident** was provided by the eyewitnesses, Harrison and Dreves.  Harrison testified that "the fog was lifting … it wasn't real bright … but it was still **pretty good visibility**."  N.T., 6/18/2012, at 28-29 (emphasis added).  Dreves also testified that although there was "a real light fog[, he] could see the lead car" in their convoy.  *Id.* at 52.  Indeed, there was no testimony from any of the eyewitnesses that adverse weather conditions caused poor visibility and contributed to the accident.

Nevertheless, Bizzak was permitted to testify (1) that the investigating officer concluded in his report that fog "was likely a factor or cause of the

---

[10] *See* N.T., 6/18/2012, at 107.  In fact, the officer did not arrive at the scene until approximately two hours after the crash.  *Id.* at 68.  When asked if there was "still a slight fog at the time of the accident[,]" he replied, "That's what was reported to me." *Id.* at 107.

accident[,]" (2) that based upon Bizzak's review of the accident scene photos, and experimentation with a similar lighting assembly, he determined the victim's headlights were off at the time of the accident, (3) that Dreves, who was beside Wetzel's vehicle "just before the collision did not see the [victim's] pickup approaching[,]" and (4) that "in foggy conditions if somebody's lights are not on they are more difficult to see." *Id.* at 63, 71, 72-73. Therefore, Bizzak was permitted to testify regarding the factors that he believed contributed to the accident, and we detect no abuse of discretion on the part of the trial court in precluding Bizzak from providing a speculative opinion as to what the drivers did or did not see immediately before the collision. Accordingly, Wetzel's second claim fails.

In his third issue, Wetzel argues the trial court erred in limiting his attorney's closing arguments. Specifically, the court prohibited defense counsel from providing the jury with illustrations on the concepts of reasonable doubt and gross negligence. Wetzel contends "[i]t was crucial for the defense counsel to be able to explain both reasonable doubt and gross negligence to the jury in terms that would be able to apply to everyday life" as opposed to simply in legal terms. Wetzel's Brief at 42.

It is well-established that "it is the province of the trial court to instruct the jury as to the law which applies in a particular case." *Commonwealth v. Crawford*, 427 A.2d 166, 172 (Pa. Super. 1981). Nevertheless, counsel for both the defense and the Commonwealth is permitted to discuss the law in closing arguments "as long as he[ or she]

states the law clearly and accurately." ***Commonwealth v. Rios***, 684 A.2d

1025, 1034 (Pa. 1996), *cert. denied*, 520 U.S. 1231 (1997).

Here, Wetzel argues the trial court improperly sustained the

Commonwealth's objections to two illustrations his counsel provided during

closing arguments. Both times, counsel informed the jury that the judge will

instruct them on the law. He then proceeded to give illustrations concerning

the applicable law. First, in discussing the concept of reasonable doubt,

Wetzel's attorney stated:

> Probably the greatest purchase we will ever make in our lives is
> the purchase of a home. So you decide one day it is time to
> purchase that home and maybe you decide, well, I am going to
> make a list of what I am looking for in that home. Location,
> perhaps school district, in your price range, the style of home.
> You get yourself a real estate agent, and then one day you get
> the phone call, "I found a house." You go over and sure enough
> it's everything on that list. You walk through the house and
> when you come down, there in front of you is the agreement of
> sale. The question then becomes do you sign that agreement of
> sale right then and there, or do you pause and say, you know
> what, this is a big decision; I'm going to think about it. Well, if
> you pause or hesitate, that is what –
>
> [Prosecutor]: Your Honor, I am going to object to his
> definition of reasonable doubt.

N.T., 6/19/2012, at 91-92. After a sidebar discussion, the trial court

sustained the Commonwealth's objection, stating "I don't agree that is an

accurate analogy of reasonable doubt, and I'm going to tell the jury that I

will tell them what a reasonable doubt is and we will move on." ***Id.*** at 93

The trial court then instructed the jury, "[W]ith regard to [defense counsel's]

definition of reasonable doubt, I will give you instructions that you will follow on that subject." ***Id.***

Next, with respect to the *mens rea* of gross negligence, necessary to convict a defendant of homicide by vehicle, counsel argued:

> Merely violating the Motor Vehicle Code and there being an ensuing death is not enough. There has to be gross negligence or recklessness. Again, the Court will define that for you. But in your everyday life when you think of traffic, when you think of what constitutes the gross deviation of standard, a person driving down the road inattentive, inattentiveness does not constitute gross negligence. Decides to make a left-hand turn into a convenience store and not paying attention doesn't see a vehicle, a motorcycle, coming the other way –
>
> [Prosecutor]: Your Honor, I am going to object to a recitation by defense attorney as to what he believes is gross negligence or not gross negligence. That would be a jury decision based on the facts of this case, not any other facts.
>
> [Defense Counsel]: Your Honor, it's not my belief; it is the case law, and I believe I am allowed to in argument--
>
> [Prosecutor]: Your Honor, can we have a side bar?

N.T., 6/19/2012, at 104. During the ensuing sidebar discussion, the trial court recognized that defense counsel's example was based upon the facts of the Supreme Court's decision in ***Commonwealth v. Heck***, 535 A.2d 575 (Pa. 1987), but sustained the Commonwealth's objection.

In its opinion, the trial court explained that it sustained the objections because it believed defense counsel's examples "might confuse the jury." Trial Court Opinion, 5/9/2013, at 22, 25. In particular, with regard to counsel's reliance on the ***Heck*** case, the court stated, "[s]hort of reading the

entire case the use of particular facts in relation to the standard of gross negligence would be incomplete and the jury needed to decide gross negligence based on the facts present in the case at hand, not the **Heck** facts." **Id.** at 24. Furthermore, during its charge, the trial court instructed the jury on the concepts of reasonable doubt and gross negligence, and Wetzel raised no object to the court's charge.[11] **See** N.T., 6/19/2012, at 137, 150-151, 153. Therefore, no relief is warranted on this claim.

Lastly, Wetzel challenges the weight of the evidence, arguing that the testimony did not support a finding of gross negligence. We find this issue waived.

It is well-settled that when reviewing a weight of the evidence claim,

> an appellate court does not substitute its judgment for the finder of fact and consider the underlying question of whether the verdict is against the weight of the evidence, but, rather,

---

[11] We note the trial court's instruction on the concept of gross negligence as applicable to a charge of homicide by vehicle appears to be incorrect. **See** N.T., 6/19/2010, at 150-151. While the definition of gross negligence provided by the trial court was proper under the pre-2001 version of the statute when the required *mens rea* was "unintentionally," the charge was amended, effective February 18, 2001, to require a *mens rea* of "recklessly or with gross negligence." 75 Pa.C.S.A. § 3732, 2000, Dec. 20, P.L. 772, No. 108, § 1, effective in 60 days. Under the current version of the statute, "the concept of gross negligence is encompassed within the concept of recklessness[.]" **Commonwealth v. Grimes**, 842 A.2d 432, 434 (Pa. Super. 2004), *appeal denied*, 864 A.2d 1203 (Pa. Super. 2004). Nevertheless, as noted above, Wetzel failed to object to the trial court's charge. Accordingly, the propriety of the instruction is not before us on appeal. Furthermore, we note the **Heck** case, upon which counsel relied for its illustration, was also decided under the former statute.

determines only whether the trial court abused its discretion in making its determination.

*Commonwealth v. Lyons*, 79 A.3d 1053, 1067 (Pa. 2013), *cert. denied*, 134 S. Ct. 1792 (U.S. 2014). For that reason, "[a] weight of the evidence claim must be preserved either in a post-sentence motion, by a written motion before sentencing, or orally prior to sentencing. *Commonwealth v. Lofton*, 57 A.3d 1270, 1273 (Pa. Super. 2012), *appeal denied*, 69 A.3d 601 (Pa. 2013) *(*citations omitted). *See* Pa.R.Crim.P. 607.

Here, Wetzel neglected to challenge the weight of the evidence in his post-sentence motion. Nor did he raise a challenge either prior to or during the sentencing hearing. *See generally* N.T. 8/20/2012. Therefore, Wetzel's final claim is waived for our review.[12]

Judgment of sentence affirmed. Commonwealth's Motion to Expedite Panel Decision is denied as moot.

_____

[12] We note the trial court found the issue waived for a different reason, namely, that the issue as framed in Wetzel's concise statement, was too vague to permit review. Trial Court Opinion, 5/9/2013, at 26. *See Commonwealth v. Hansley*, 24 A.3d 410, 415 (Pa. Super. 2011) ("[I]f a concise statement is too vague, the court may find waiver."), *appeal denied*, 32 A.3d 1275 (Pa. 2011). However, this Court may affirm a trial court's decision if it is correct on any basis." *Commonwealth v. Turner*, 73 A.3d 1283, 1286 (Pa. Super. 2013), *appeal denied*, 91 A.3d 162 (Pa. 2014).

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 12/24/2014